## Case No. 13,697.

SWIFT et al. v. The HAPPY RETURN.

[1 Pet. Adm. 253.][1]

District Court, D. Pennsylvania. 1799.

SEAMEN—DUTY IN UNLADING—DURING VOYAGE— END OF VOYAGE — SUPPLEMENTARY LABOR — WHEN WAGES DUE—PHILADELPHIA CUSTOM.

1. Whether mariners are bound, when the voyage is ended, to unlade the ship.
  [Cited in Knagg v. Goldsmith, Case No. 7,872; Packard v. The Louisa, Id. 10,652.]

2. Guindage, or hoisting, supplementary labour, and extra allowance therefor.

3. Wages of navigation, and those for loading and unloading, distinct.
  [Cited in The Martha, Case No. 9,144.]

4. Seaman bound to unlade and relade, at any port on the voyage.
  [Cited in Florez v. The Scotia, 35 Fed. 916; Cuban Steamship Co. v. Fitzpatrick, 66 Fed. 66.]

5. End of the voyage, and discharge of the cargo separate subjects.

6. Custom in Philadelphia to hire others than the crew to unlade.

[7. Cited in Slacum v. Smith, Case No. 12,- 936, to the point that the absenting of a seaman from the vessel after the voyage was ended, and before the cargo was discharged, is not a forfeiture of wages.]

[8. Cited in The Nimrod, Case No. 10,267; Harden v. Gorden, Id. 6,047; Freeman v. Baker, Id. 5,084; Holmes v. Hutchinson, Id. 6,639; The Forest, Id. 4,936,—to the point that, by the

[1] Reported by Richard Peters, Jr., Esq.]

general maritime law, if a seaman falls sick during the voyage, he is to be cured at the expense of the vessel.]

[9. Cited in The Childe Harold, Case No. 2,676, to the point that feeding a crew on unwholesome or spoiled provisions would justify their leaving the ship, and such neglect of the owner would subject him, at least, to pay full wages for the voyage.]

[10. Disapproved in The William Jarvis, Case No. 17,697, upon the point that wages are not payable until the expiration of the period allowed for collecting the freight.]

[This was a libel for wages by Swift, Hastings, and others, against the Happy Return.]

PETERS, District Judge. As to mariners shipped "for the voyage," unless specially obliged by the articles, as they are in many ports of the United States, and elsewhere, it is questionable whether or not they are bound to unlade the ship, after the voyage is ended. I incline to think they are not so bound: the voyage is ended when the vessel has arrived at her last port of delivery, and is there safely moored. Should it be deemed an additional duty to their common maritime employment to unlade the cargo, they are only answerable in damages for neglect or refusal. The contract for the voyage cannot be so amplified and prolonged, as to subject mariners to forfeitures, after the voyage is completed, though the lading or ballast be not discharged. Laws so highly penal, must be construed strictly. In 1 Strange, 405, it will be seen that the general doctrine is, that "no wages are payable while the ship is lading or unlading." I presume, at the port of outfit and return, as well as under the circumstances developed in this case.

By the Laws of Wisbuy (article 5) "the mariners shall have three deniers a last, for loading, and three for unloading; which is to be reckoned only as their wages for guindage or hoisting." These duties "are never fixed on account of the dearness of provisions, and the value of money, which changes and encreases daily. The rate of guindage or reguindage" (hoisting up and down, or loading and unloading) "is commonly in France, five sols a last, which is two sols six deniers turnois, a tun." These authorities, among others, shew that there is a distinction in the maritime laws, between the wages of navigation, and those allowed for loading and unloading; the latter being considered independent and distinct services from the former. On the voyage, at a foreign port of delivery, the seamen are certainly bound, under the penalty of forfeiture of wages, &c. to unlade and reload the ship.

Our act of congress for regulating seamen [1 Stat. 131] only fixes, and with too little precision, the time when the wages are due and payable. It does not specifically declare who shall unlade the ship, after the voyage is ended: the words are, "and as soon as

the voyage is ended, and the cargo or ballast be fully discharged, at the last port of delivery, every seaman or mariner, shall be entitled to the wages which shall be then due, according to his contract." By this it seems obvious to me, that in the contemplation of this law, following the principles of the maritime laws of other nations, the end of the voyage, "and the discharge of the cargo," are separate and distinct subjects; though time, after the discharge, is given to the merchant and master, to enquire into embezzlements and other malfeazances, and to collect the freight. The wages of the mariner are "due, according to his contract," when the voyage is ended, though not payable, until the expiration of the period allowed for collecting the freight. It is debitum in presenti: solvendum in futuro.

Advantage of neglect or refusal to unload has been seldom attempted to be taken in this port, with the single and bona fide intent of compelling the seamen to perform this service. Forfeitures of wages for a whole voyage have been called for on this account, most frequently when old quarrels at sea, or recent animosities, or differences about accounts, have embittered the parties. The law is too often, in violation of its principles, spirit and system, considered and applied to, as a means to gratify the passions. In disputes relative to seamen's wages, the most irksome and unpleasant part of my duty, this propensity is too often evinced, by one or the other party. In this port, it is the general custom to hire others than the mariners to lade and unlade vessels. The merchants find it more for their interest so to do, than to depend on the mariners, who are particularly ungovernable after a voyage is ended; and are, when arrived at home, impatient under confinement to the drudgery of unlading the cargo. The owners, too, wish to avoid the trouble, danger and expense of keeping fire, and cooking and furnishing provisions[2] on

---

[2] Expenses for boarding on shore, in a foreign port particularly, have been often brought forward. I have always determined according to circumstances, finding no direct rule to guide me. Cooking and provisions actually furnished on board, have always been decisive with me, to deny allowance for boarding on shore. But where these have not been afforded; or if insufficient, irregular, or unsound, I have deemed myself justified in allowing charges for boarding. In one case, very atrocious, I would have gone the length of payment equal to that directed for short allowance, but an accommodation took place. Expenses for boarding on shore have sometimes been voluntarily agreed to be paid; at others, so trifling a sum has been allowed by the master to the mariners, that I have been obliged to increase it, to a reasonable rate. Where no provisions were provided on board, or the means of supporting themselves on shore furnished, I have deemed it justifiable in the mariners to leave the ship; after tendering themselves ready to do duty, on being furnished with money or provisions for their support.

Controversies often arise on hospital bills, paid for sick sailors sent on shore in foreign ports. I have seldom satisfied myself in the decisions

board the ship. This point is therefore rendered less important, under the custom prevailing here.

---

I have been obliged to give in such cases. The charge for medical or chirurgical advice, is commonly mixed in the gross, with the general items, per day or week, for boarding and attendance. The sailor must only pay for the former. I think, if the merchant cannot specify the amount of this charge, he should pay it himself; as it is impracticable to fix it at discretion, in any just proportion; and I have sometimes erred in attempting it. By the Laws of Oleron, a ship-boy, or nurse, must attend a sick seaman on shore; which would be more expensive than the controverted charges. When one of a crew is seized with an infectious disease, he should be removed from the rest, and sent on shore, at the ship's expense, for the safety of the whole, and the advantage of the owner, who must count on extra disbursements, if he will trade to ports or places, liable to such casualties. The charge should not be thrown on the sailor, and niceties insisted on, to shew that it was incurred at his request. It ought to be borne, from motives both of humanity and justice. So should it be, when proper care cannot be taken of sick seamen on board, and particularly when most, if not all, of the crew are infected. It is often endeavoured to be shewn that a sick seaman made his election to go on shore, and therefore he should pay the expense: but this is not correct. The Law of Oleron expressly directs, that a sick seaman (one really ill) shall be put on shore, and a ship-boy or nurse employed to attend him, at the expense of the ship. The interests of commerce require liberality on this subject; yet I have, frequently, and most painfully, witnessed a contrary disposition. Laws cannot be made to reach every point. Although in ordinary cases, having a medicine chest on board, may be a compliance with the act of congress, exceptions should be made. where dangerous diseases require, and compel, extraordinary remedies and expense.